CASE NOT YET SCHEDULED FOR ORAL ARGUMENT

CASE NO. 12-1362
Consolidated with Case No. 12-1363

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————————

THE TOWN OF BARNSTABLE, MASSACHUSETTS and
THE ALLIANCE TO PROTECT NANTUCKET SOUND,
Petitioners

v.

FEDERAL AVIATION ADMINISTRATION,
Respondent

CAPE WIND ASSOCIATES, LLC,
Intervenor

———————————————————

**JOINT BRIEF OF PETITIONERS THE TOWN OF BARNSTABLE
AND THE ALLIANCE TO PROTECT NANTUCKET SOUND
AND
JOINT ADDENDUM OF STATUTES AND REGULATIONS**

———————————————————

Review of FAA Determinations of No Hazard to Air Navigation issued on August
15, 2012 for Aeronautical Study Nos. 2012-WTE-322-OE - 2012-WTE-451-OE.

———————————————————

W. Eric Pilsk,
*epilsk@kaplankirsch.com*
Catherine M. van Heuven,
*cvanheuven@kaplankirsch.com*
Kaplan Kirsch & Rockwell LLP
1001 Connecticut Ave., N.W., Suite 800
Washington, DC 20036
Telephone: (202) 955-5600
Counsel to Town of Barnstable

Charles C. Lemley, *clemley@wileyrein.com*
Edward P. Faberman,
*efaberman@wileyrein.com*
Wiley Rein LLP
1776 K Street NW
Washington, DC 20006
Telephone: (202) 719-7000
Counsel to the Alliance to Protect Nantucket
Sound

## CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioners Town of Barnstable and the Alliance to Protect Nantucket Sound certify as follows:

### 1.    Parties and Amici

- The Petitioners are the Town of Barnstable, Massachusetts (Town) and the Alliance to Protect Nantucket Sound (APNS).

- The Respondent is the Federal Aviation Administration (FAA).

- Cape Wind Associates, LLC (CWA) has intervened.

### 2.    Rulings Under Review

The rulings under review are the Determinations of No Hazard (Determinations) for Aeronautical Study Nos. 2012-WTE-322-OE through 2012-WTE-451-OE, which FAA issued on August 15, 2012 for the 130 wind turbine generators (Turbines) that CWA proposes to build on Horseshoe Shoal in Nantucket Sound (the Project).  All of the Determinations are identical, except for the case number and location of the specific Turbine.  For the convenience of the Court and the parties, only one of the Determinations is included in the Addendum.

### 3.    Related Cases

A case involving the identical parties and issues was heard by this Court in *Town of Barnstable v. Federal Aviation Administration*, Case No. 10-1276, 659

F.3d 28 (D.C. Cir. 2011).  In that case, the court vacated FAA's Determinations of No Hazard and remanded the matter to the FAA for further analysis.

On August 22, 2012, the Alliance to Protect Nantucket Sound filed a Petition for Review, Case No. 12-1363, challenging the same decisions on review here.  By Order dated August 22, 2012, the Court consolidated Case No. 12-1363 with Case No. 12-1362.

/S/
_____

W. Eric Pilsk,
epilsk@kaplankirsch.com
Catherine M. van Heuven,
cvanheuven@kaplankirsch.com
Kaplan Kirsch & Rockwell LLP
1001 Connecticut Ave., N.W.,
Suite 800
Washington, DC 20036
Telephone: (202) 955-5600

Charles S. McLaughlin, Jr.
Assistant Town Attorney
Town Hall - 367 Main Street
Hyannis, MA, 02601
Telephone:  (508) 862-4620
Facsimile:  (508) 862-4724

Counsel to Town of Barnstable

_____

Charles C. Lemley,
clemley@wileyrein.com
Edward P. Faberman,
efaberman@wileyrein.com
Wiley Rein LLP
1776 K Street NW
Washington, DC 20006
Telephone: (202) 719-7000

Counsel to the Alliance to Protect
Nantucket Sound

## ALLIANCE TO PROTECT NANTUCKET SOUND
## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner Alliance to Protect Nantucket Sound declares that it is an independent, non-profit organization classified under section 501(c)(3) of the Internal Revenue Code, and has no parent corporation, subsidiaries, or affiliates that have issued shares to the public.  Petitioner is dedicated to the long-term preservation of Nantucket Sound and was formed in response to a proposal to build a wind farm in Nantucket Sound.

_____
Charles C. Lemley,
clemley@wileyrein.com
Edward P. Faberman,
efaberman@wileyrein.com
Wiley Rein LLP
1776 K Street NW
Washington, DC 20006
Telephone: (202) 719-7000

Counsel to the Alliance to Protect Nantucket Sound

# TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES ................................................................................. i

    1.   Parties and Amici ................................................................. i

    2.   Rulings Under Review ......................................................... i

    3.   Related Cases ...................................................................... i

RULE 26.1 DISCLOSURE STATEMENT ........................................... iii

TABLE OF CONTENTS ....................................................................... iv

TABLE OF AUTHORITIES ................................................................ vii

STATEMENT REGARDING ADDENDUM OF STATUTES AND REGULATIONS .................................................................................. xiii

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF ISSUES ..................................................................... 2

STATEMENT OF THE CASE ................................................................ 3

STATUTORY FRAMEWORK AND STATEMENT OF THE FACTS ............... 5

I.       STATUTORY AND REGULATORY FRAMEWORK ......................... 5

    A.   The Part 77 Process ............................................................ 7

    B.   Determinations of Hazard or No Hazard ............................. 8

II.      FACTS OF THE CASE ............................................................. 14

    A.   The Parties and the Project ................................................ 14

    B.   Aviation Over the Project Area .......................................... 14

    C.   The Impact of the Turbines on Aviation ........................... 16

    D.   Project History .................................................................. 21

SUMMARY OF ARGUMENT ............................................................. 27

STANDING ....................................................................................... 28

ARGUMENT .................................................................................................30

I.      STANDARD OF REVIEW.................................................................30

II.     IN VIOLATION OF THE CLEAR INSTRUCTIONS OF THIS
        COURT ON REMAND, THE PLAIN TERMS OF ITS BINDING
        HANDBOOK, AND THE CONTROLLING STATUTE, FAA
        IGNORED EVIDENCE IN THE RECORD SHOWING THAT THE
        TURBINES WOULD HAVE A SUBSTANTIAL ADVERSE
        IMPACT ON VFR OPERATIONS .....................................................31

        A.   FAA Again Relied On Its Erroneous View That A Structure Can
             Only Be A Hazard If It Is An "Obstruction" .........................................32

        B.   FAA Failed To Conduct The Safety Analysis Mandated By The
             Court.........................................................................................................38

III.    FAA'S POSITION THAT THERE WOULD BE NO ADVERSE
        EFFECTS TO EXISTING RADARS IS UNREASONABLE AND
        NOT SUPPORTED BY SUBSTANTIAL EVIDENCE............................43

        A.   FAA's Proposed Mitigation For Acknowledged Interference
             With The Otis ASR-8 Is Insufficient ......................................................44

             1.   FAA's Tiered Mitigation Proposal Would Frustrate
                  Statutory and Regulatory Requirements by Allowing the
                  Turbines to Be Erected *Before* Knowing Whether Radar
                  Interference Can Be Mitigated ......................................................44

             2.   The TDX-2000 May Not Mitigate The Known Adverse
                  Effects of the Turbines.................................................................46

             3.   The ASR-11 Also May Not Resolve the Acknowledged
                  Interference Issues .......................................................................48

        B.   FAA Unreasonably Dismissed Substantial Evidence of Other
             Adverse Effects to Radar .......................................................................50

             1.   FAA Did Not Address Evidence Of Shadowing Effects To
                  Secondary (Beacon) Radar ...........................................................50

             2.   FAA Did Not Address Evidence Of Shadowing Effects To
                  Primary (Search) Radar .................................................................52

             3.   FAA Failed To Address Evidence Of Decreased Probability
                  of Detection For Primary Radars...................................................54

    4.    FAA Failed To Fully Analyze Impacts To The Truro ARSR-4 .................................................................................55

    5.    FAA Did Not Take Into Account the Unique Weather Conditions in Nantucket Sound ..................................................56

    6.    The Determinations Failed to Impose Mitigation Measures That FAA Itself Identified as Necessary .......................................57

IV.    FAA FAILED TO PERFORM OR PARTICIPATE IN ANY ANALYSIS OF THE ENVIRONMENTAL IMPACTS OF ITS DECISION AS REQUIRED BY NEPA .......................................58

CONCLUSION, RELIEF SOUGHT AND REQUEST FOR ORAL ARGUMENT ........................................................................59

CERTIFICATE OF COMPLIANCE .....................................................61

CERTIFICATE OF SERVICE ..............................................................62

## TABLE OF AUTHORITIES

*Authorities upon which we chiefly rely are marked with an asterisk.

**Cases**

*Air Line Pilots' Ass'n Int'l v. FAA,
    446 F.2d 236 (5th Cir. 1971).................................................................7, 44, 46

Am. Airlines, Inc. v. Transp. Sec. Admin.,
    665 F.3d 170 (D.C. Cir. 2011).................................................................34, 41

Ass'n of Private Sector Colleges & Universities v. Duncan,
    681 F.3d 427 (D.C. Cir. 2012)...........................................................................36

BFI Waste Sys. of N. Am., Inc., v. FAA,
    293 F.3d 527 (D.C. Cir. 2002).......................................................................6, 30

Simpson v. Young,
    854 F.2d 1429 (D.C. Cir. 1988).........................................................................50

*Clark Cnty. v. FAA,
    522 F.3d 437 (D.C. Cir. 2008).............................................................................45

Cont'l Air Lines, Inc. v. C. A. B.,
    551 F.2d 1293 (D.C. Cir. 1977).............................................................46, 47, 52

In re Espy,
    80 F.3d 501 (D.C.Cir.1996)...............................................................................36

Simpson v. Young,
    854 F.2d 1429 (D.C. Cir. 1988).........................................................................50

City of Cleveland v. Fed. Power Comm'n,
    561 F.2d 344 (D.C. Cir. 1977)...........................................................................31

D&F Afonso Realty Trust v. FAA,
    216 F.3d 1191 (D.C. Cir. 2000)....................................................................30, 31

*Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc,*
    528 U.S. 167 (2000)...........................................................................29

*Greater Orlando Aviation Auth. v. FAA,*
    939 F.2d 954 (11th Cir. 1991) .........................................................37

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)...........................................................................29

*New York v. Nuclear Regulatory Comm'n,*
    681 F.3d 471 (D.C. Cir. 2012).....................................................58, 59

*Town of Barnstable v. FAA,*
    659 F.3d 28 (D.C. Cir. 2011).......................2, 4, 10, 14, 16, 23, 25-33, 35, 37-39

## Statutes

5 U.S.C. §702 ........................................................................................2

42 U.S.C. §4332 ...............................................................................3, 58

*49 U.S.C. §44718.................................6, 27, 30, 34, 36, 37-38, 41, 44, 55

49 U.S.C. §46110 ..........................................................................2, 29, 30

## Regulations

14 C.F.R. §77.17(a)(1) .....................................................................8, 35

14 C.F.R. §77.17(a)(4) ...........................................................................8

14 C.F.R. §77.25(c).................................................................................8

14 C.F.R. §77.29 ....................................................................................6

14 C.F.R. §77.31(b) ................................................................................9

14 C.F.R. Part 77, Subpart B (§§ 77.5 – 77.11)....................................7

14 C.F.R. Part 77, Subpart C (§§ 77.13 – 77.23)...............................7, 33

14 C.F.R. §91.119 .............................................................................11, 24

40 C.F.R. §1508.8(b) ............................................................................58

40 C.F.R. §1508.18 ...............................................................................58

**Legislative and Regulatory Materials**

FAA Order 7400.2J, *Procedures for Handling Airspace Matters*
(Feb. 9, 2012).........................................2, 6-12, 20, 23-24, 32-33, 35-37, 41-42, 45

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| 2009 Radar Report | FAA, *Impact Study of 130 Offshore Wind Turbines In Nantucket Sound* (Mar. 3, 2009) |
| 2010 Determinations | The Determinations of No Hazard issued by FAA on May 17, 2010 for FAA Aeronautical Study Nos. 2009 WTE-332-OE through 2009 WTE-461-OE, inclusive. |
| 2010 Radar Report | FAA, *Surveillance Engineering Study: Testing the FMH ASR-8 to Predict the Effects of the Cape Wind Wind Turbine Project* (Feb. 23, 2010) (rev'd) |
| 2012 Aeronautical Studies | FAA Aeronautical Study Nos. 2012-WTE-322-OE through 2012-WTE-451-OE, inclusive. |
| 2012 Determinations | The Determinations of No Hazard issued by FAA on August 15, 2012 for the 2012 Aeronautical Studies |
| Addendum | Addendum of Statutes, Regulations, Legislative Materials, Standing Declaration and Rulings under Review, filed herewith as attached Addendum |
| *ALPA* | *Air Line Pilots' Ass'n Int'l v. FAA*, 446 F.2d 236 (5th Cir. 1971) |
| APA | Administrative Procedure Act, 5 U.S.C. §701, *et seq*. |
| APNS | The Alliance to Protect Nantucket Sound |
| ASL | Above Sea Level |
| ATC | Air Traffic Control |

| | |
|---|---|
| BOEM | U.S. Department of the Interior, Bureau of Ocean Energy Management (formerly the Minerals Management Service) |
| CWA | Cape Wind Associates, LLC |
| FAA | Federal Aviation Administration |
| FMH | Otis Air National Guard Base in Falmouth, Massachusetts |
| Guidelines | FAA, *Guidelines for Evaluating Wind Turbine Impacts to Radars*, Version 1.34 (Dec. 2010) |
| Handbook | FAA Order 7400.2J, *Procedures for Handling Airspace Matters* (Feb. 9, 2012) (*see also* "Order 7400.2J") |
| HYA | Barnstable Municipal Airport |
| IFR | Instrument Flight Rules |
| J.A. | Joint Appendix |
| MITRE Report | MITRE Corporation Technical Report, *VFR Traffic Analysis for the Proposed Horseshow Shoal Wind Farm* (July 19, 2012) |
| MMS | U.S. Department of the Interior, Minerals Management Service (since replaced by the Bureau of Ocean Energy Management) |
| Nantucket ASR-9 | Air Surveillance Radar-9 at Nantucket Memorial Airport |
| NEPA | National Environmental Policy Act, 42 U.S.C. §4321 *et seq.* |
| Nm | Nautical Miles |
| Order 7400.2J | FAA Order 7400.2J, *Procedures for Handling Airspace Matters* (Feb. 9, 2012) (*see also* "Handbook") |

| | |
|---|---|
| Otis ASR-8 | Air Surveillance Radar-8 at Otis Air National Guard Base in Falmouth, Massachusetts |
| Part 77 | 14 C.F.R. Part 77 (*Objects Affecting Navigable Airspace*) |
| Project | The 130 Turbines Cape Wind Associates proposes to build on Horseshoe Shoal in Nantucket Sound, which structures are the subject of the 2012 Determinations |
| Record or R. | The Administrative Record in this case |
| Tech Ops | FAA Technical Operations Division |
| TRACON | FAA Terminal Radar Approach Control |
| Truro ARSR-4 | Air Route Surveillance Radar at North Truro Air Force Station (California) |
| Turbines | The 130 wind turbines Cape Wind Associates proposes to build on Horseshoe Shoal in Nantucket Sound, which structures are the subject of the 2012 Determinations |
| VFR | Visual Flight Rules |

## STATEMENT REGARDING ADDENDUM OF STATUTES AND REGULATIONS

Pursuant to Circuit Rule 28(a)(5), copies of the following pertinent statutes

and regulations, and a copy of FAA's decisions under review, are set forth in the

attached Addendum:

| **Tab** | **Document** | **Page** |
|---------|--------------|----------|
| 1. | Determination of No Hazard to Air Navigation, FAA Aeronautical Study No. 2012 WTE-322-OE (August 15, 2012) | 1 |
| 2. | 49 U.S.C. § 46110 | 13 |
| 3. | 5 U.S.C. § 702 | 15 |
| 4. | FAA Order 7400.2J, *Procedures for Handling Airspace Matters* (Feb. 9, 2012) (Excerpts) | 16 |
| 5. | 49 U.S.C. § 44718 | 38 |
| 6. | 14 C.F.R. Part 77 | 40 |
| 7. | 14 C.F.R. § 91.119 | 50 |
| 8. | Declaration of Roland Breault | 52 |
| 9. | Declaration of Audra Parker | 55 |
| 10. | 42 U.S.C. § 4332(2)(C) | 57 |
| 11. | 40 C.F.R. § 1508.18 | 60 |
| 12. | 40 C.F.R. §1508.8(b) | 61 |

CASE NOT YET SCHEDULED FOR ORAL ARGUMENT

CASE NO. 12-1362
Consolidated with Case No. 12-1363

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

THE TOWN OF BARNSTABLE, MASSACHUSETTS and
THE ALLIANCE TO PROTECT NANTUCKET SOUND,
Petitioners

v.

FEDERAL AVIATION ADMINISTRATION,
Respondent

CAPE WIND ASSOCIATES, LLC,
Intervenor

_____

**JOINT BRIEF OF PETITIONERS THE TOWN OF BARNSTABLE
AND THE ALLIANCE TO PROTECT NANTUCKET SOUND**

_____

Review of Federal Aviation Administration Determinations of No Hazard to Air Navigation issued on August 15, 2012 for Aeronautical Study Numbers 2012-WTE-322-OE through 2012-WTE-451-OE.

_____

**JURISDICTIONAL STATEMENT**

On August 15, 2012, the Federal Aviation Administration (FAA) issued

Determinations of No Hazard (2012 Determinations) for 130 wind energy turbines

(Turbines), each 440 feet high, to be located in a 25-square mile area of Nantucket

Sound.  The 2012 Determinations are final agency decisions subject to appeal in

1

this Court. 49 U.S.C. §46110(a) (Addendum of Statutes and Regulations (Addendum) 13). The Town of Barnstable, Massachusetts (Town) timely filed its Petition for Review on August 22, 2012, pursuant to 49 U.S.C. §46110(a). On the same date, the Alliance to Protect Nantucket Sound (APNS) timely filed its Petition for Review.

This court has jurisdiction pursuant to 49 U.S.C. §46110(c) (Addendum 13), and the Administrative Procedure Act (APA), 5 U.S.C. §702 (Addendum 15).

## STATEMENT OF ISSUES

In *Town of Barnstable v. FAA,* 659 F.3d 28 (D.C. Cir. 2011), the Court vacated FAA's May 17, 2010, Determinations of No Hazard (2010 Determinations) for the same Turbines at issue here because FAA violated its Order 7400.2J, *Procedures for Handling Airspace Matters* (Handbook) when it failed to evaluate the safety risks posed by the Turbines on visual flight rule (VFR) flights on the ground that the Turbines would not exceed one of FAA's "obstruction" standards. The Court did not address the adequacy of FAA's analysis of how the Turbines would affect the operation of near-by radars. This case is a challenge to FAA's decision following the remand, and presents the following issues:

1.    Whether FAA acted in an arbitrary and capricious manner, exceeded its authority, or otherwise erred when it issued Determinations of No Hazard

2

without analyzing the safety risks posed by the proposed Turbines solely because the Turbines would not exceed one of FAA's "obstruction" standards.

2.     Whether FAA acted in an arbitrary and capricious manner, exceeded its authority, or otherwise erred when it issued Determinations of No Hazard, notwithstanding that the Turbines would create an adverse effect on the operation of air navigation facilities by interfering with the operation of existing FAA radar facilities.

3.     Whether FAA acted in an arbitrary and capricious manner, exceeded its authority, or otherwise erred when it failed to perform any environmental review as required by the National Environmental Policy Act (NEPA), 42 U.S.C. §4332 prior to issuing the Determinations of No Hazard for the Turbines.

## STATEMENT OF THE CASE

Cape Wind Associates, LLC (CWA) seeks to build 130 Turbines, each approximately 440 feet tall, in a 25-square mile area of Nantucket Sound known as Horseshoe Shoal.  Administrative Record Item (R. or Record) 56 at 1, 3 (Joint Appendix (J.A.) __, __).  The Turbines would be located in the middle of a heavily-trafficked flight corridor, and in close proximity to three airports – the Barnstable Municipal Airport, the Nantucket Memorial Airport, and the Martha's Vineyard Airport.  R.53 at 1 (J.A. __).  A substantial number of regularly-occurring flights would be required to alter their course or altitude to avoid the

3

Turbines.  R.37, Item 1112 at Exs. 3 at 1-2, 20 at 2-3, 21 at ¶¶10-13 & 22 at 2-9 (J.A. __-__, __-__, __-__ & __-__).  In addition, the Project is in radar line-of-sight of, and would interfere with, three existing FAA radar facilities.  R.53 at 6 (J.A. __).

FAA issued Determinations of No Hazard for all 130 Turbines on May 17, 2010 (2010 Determinations).  On October 28, 2011, this Court vacated and remanded the 2010 Determinations because FAA had misapplied its Handbook by finding that the Turbines would not have an adverse aeronautical effect on flight operations, despite admitted interference with flights, solely because the Turbines did not meet FAA's technical definition of an "obstruction."  *Town of Barnstable*, 659 F.3d. at 35-36.  On remand, the Court directed FAA to analyze the safety risks posed by the Turbines and report its findings.  *Id.*  The Court did not reach the independent issue of whether FAA erred in concluding that the admitted interference with radar facilities could be mitigated.

On August 15, 2012, following remand, FAA issued the 2012 Determinations.  The 2012 Determinations repeat the same errors of the 2010 Determinations and should also be vacated.  Specifically, in violation of the Handbook, statute, and the letter and spirit of *Town of Barnstable*, FAA again concluded that despite acknowledged interference with VFR flights, the Turbines could not have an adverse aeronautical effect because they would not exceed an

4

"obstruction" standard.  FAA failed to conduct any study or analysis of the safety risks posed by the Turbines.  FAA also failed to properly assess how the Turbines would impair radar facilities by relying on unproven mitigation measures to address acknowledged interference with the existing ASR-8 radar at Otis Air National Guard Base in Falmouth, Massachusetts (Otis or FMH) and by failing to address substantial evidence of adverse effects to other radar facilities near the Turbines.  Finally, FAA failed to conduct any environmental review of the Turbines pursuant to NEPA.

## STATUTORY FRAMEWORK AND STATEMENT OF THE FACTS

### I.     STATUTORY AND REGULATORY FRAMEWORK

Congress has charged FAA with assuring the safe and efficient use of the national airspace by assessing whether proposed structures might impair the use of the navigable airspace:

> [I]f the Secretary decides that constructing or altering a structure may result in an obstruction of the navigable airspace or an interference with air navigation facilities and equipment or the navigable airspace, the Secretary shall conduct an aeronautical study to decide the extent of any adverse impact on the safe and efficient use of the airspace, facilities, or equipment.   In conducting the study, the Secretary shall consider factors relevant to the efficient and effective use of the navigable airspace, including--
>
> (A) the impact on arrival, departure, and en route procedures for aircraft operating under visual flight rules;

5

        (B) the impact on arrival, departure, and en route procedures for aircraft operating under instrument flight rules;

        (C) the impact on existing public-use airports and aeronautical facilities;

… [and]

        (E) the cumulative impact resulting from the proposed construction or alteration of a structure when combined with the impact of other existing or proposed structures.

49 U.S.C. §44718(b) (Addendum 38-39); *see also* 14 C.F.R. §77.29 (Addendum 47). FAA is therefore required to conduct an aeronautical study if a structure may be one of three things: (1) an obstruction; (2) a potential interference with air navigation facilities; *or* (3) a potential interference with the navigable airspace. The aeronautical study must evaluate whether the proposed structure would cause *any* impact on the safe and efficient use of the navigable airspace.

FAA's Part 77 regulations, 14 C.F.R. Part 77 (Addendum 40-49), and its Handbook, Handbook ¶¶5-1-1 – 5-1-4 (Addendum 18), outline detailed procedures to ensure that FAA receives notice of structures that could adversely affect air navigation and that FAA performs the appropriate study to determine whether the structures would be hazards to air navigation. The Handbook sets forth binding, mandatory standards and procedures. *BFI Waste Sys. of N. Am., Inc., v. FAA*, 293 F.3d 527, 529 (D.C. Cir. 2002) (Handbook is binding). Because the national

airspace is a limited resource, FAA's first consideration must be to protect that resource:

> when conflicts arise concerning a structure being studied, the FAA emphasizes the need for conserving the navigable airspace for aircraft; preserving the integrity of the national airspace system; and protecting air navigation facilities from . . . encroachments that would preclude normal operation.
>
> ***In the case of . . . a conflicting demand for the airspace by a proposed construction or alteration, the first consideration should be given to altering the proposal.***

*Id.* ¶6-3-1 (Addendum 19) (emphasis added); *see also* Handbook ¶1-2-1 (Addendum 17).

To avoid safety problems, it is critical that FAA's hazard analysis occur *before* proposed structures are constructed. *Air Line Pilots' Ass'n Int'l v. FAA*, 446 F.2d 236, 242 (5th Cir. 1971) (*ALPA*) ("Certainly, the regulatory purpose of the safety provisions administered by the FAA contemplates that administrative evaluation of the effect of a proposed structure on air navigation comes ***before***, not ***after***, the structure is built.") (emphasis added).

### A.    The Part 77 Process

Anyone proposing to construct structures over 200 feet in height must first notify FAA.  14 C.F.R. Part 77, Subpart B (Addendum 41-43).  FAA conducts an initial evaluation of whether the structure would constitute an "obstruction."  14 C.F.R. Part 77, Subpart C.  (Addendum 43-46).  In the Part 77 process, the term

7

"obstruction" does not mean simply that a structure is an obstacle. "Obstruction has a technical meaning that describes objects exceeding certain heights defining the minimum safe altitude for aircraft operations, primarily in the immediate vicinity of airports. *E.g.,* 14 C.F.R. §§77.17(a)(1) (any structure more than 499 feet above ground level), 77.17(a)(4) (a height within an en route obstacle clearance area that would increase the minimum obstacle clearance altitude) (Addendum 44).

The obstruction evaluation alone does not produce sufficient information for FAA to determine whether the structure is a "hazard" to air navigation. FAA conducts aeronautical studies to examine the extent of adverse impacts on the safe and efficient use of the airspace, facilities or equipment, and considers effects on existing and proposed operations, airport capacity, and air navigation facilities. Handbook ¶¶6-3-8 – 6-3-10 (Addendum 21-33). During the aeronautical studies, FAA may provide notice of the studies to interested parties and an opportunity to comment on them through a process it calls "circularization." Handbook ¶6-3-17 (Addendum 34-35); 14 C.F.R. §77.25(c) (Addendum 46-47).

### B.    Determinations of Hazard or No Hazard

Once FAA has conducted its analysis, it issues a determination stating whether or not the structure would be a hazard to air navigation. The determination is based on the aeronautical study findings and must address issues

8

such as the effects on VFR and instrument flight rule (IFR) operations, minimum flight altitudes, and the extent of physical and/or electromagnetic effect on the operation of air navigation facilities.  14 C.F.R. §77.31(b) (Addendum 47).  FAA must issue a Determination of Hazard if the structure would have a "substantial adverse effect."  Handbook ¶7-1-3(e) (Addendum 36-37).[1]

Paragraph 6-3-3 of the Handbook describes what constitutes an adverse effect:

> A structure is considered to have an adverse aeronautical effect if it first exceeds the obstruction standards of part 77 and/or is found to have physical or electromagnetic radiation effect on the operation of air navigation facilities.  A proposed or existing structure … has an adverse effect if it would:
>
> (a) Require a change to an existing or planned IFR minimum flight altitude, a published or special instrument procedure, or an IFR departure procedure for a public-use airport.
>
> (b) Require a VFR operation to change its regular flight course or altitude . . .
>
> (d) Derogate airport capacity/efficiency.
>
> (e) Affect future VFR and/or IFR operations as indicated by plans on file.

(Addendum 19).

_____

[1]    FAA issued a new edition of the Handbook on February 9, 2012.  The new edition did not make any substantive changes to the sections relevant here.  The language the Court cited and quoted in *Town of Barnstable* is restated in the current edition of the Handbook.

A proposed structure would have a ***substantial*** adverse effect – and therefore constitute a hazard – if it "causes electromagnetic interference to the operation of an air navigation facility or the signal used by aircraft" or if there would be a combination of adverse effect and a "significant volume" of aeronautical activity. *Id.* ¶6-3-5 (Addendum 20). A "significant volume of activity" is defined as "one or more aeronautical operations per day," which "would indicate regular and continuing activity, thus a significant volume no matter what the type of operation." *Id.* ¶6-3-4 (Addendum 19-20).

In *Town of Barnstable,* this Court held that a structure could have a substantial adverse aeronautical effect even if the structure were ***not*** an "obstruction." 659 F.3d at 35.

### 1.    Evaluating Adverse Effect on VFR Operations

The Handbook identifies a number of factors that can lead to a finding of adverse effect on VFR operations. For example, a structure would have an adverse effect if it would "[r]equire a VFR operation to change its regular flight course or altitude." Handbook ¶6-3-3(b) (Addendum 19). A structure would also have an adverse effect on en route VFR operations if it is more than 500' high and also within 2 statute miles of any regularly used VFR route. Handbook ¶6-3-8(c)(1) (Addendum 21-28).

10

The Handbook also recognizes that while the navigable airspace generally includes all airspace above 500', it also includes that airspace **below** 500' required for certain functions including takeoff and landing at airports **and also flight over open water.** Handbook ¶6-3-8(b)(1)(b) (Addendum 21); 14 C.F.R. §91.119(c) (Addendum 50). In addition, FAA minimum obstacle clearance standards require 500' clearance over structures and objects. *Id.* As a result, if a structure is proposed to be constructed in what is currently open water, where VFR operations can fly at altitudes less than 500' above sea level (ASL), that structure could create adverse effects **even if it were less than 500' ASL**, because it would force pilots to either change their course or altitude to stay 500' above the structure. Handbook ¶6-3-3(b) (Addendum 19). *See also* R.37, Item 1112 Ex. 24 at 2 (J.A. __).

Second, the Handbook recognizes that poor weather can force pilots to fly dangerously close to structures less than 500' ASL, and requires particular analysis of those structures:

> Evaluation of obstructions located within VFR routes must recognize that pilots may, and sometimes do, operate below the floor of controlled airspace during low ceilings and 1−mile flight visibility. … [A] structure placed in this location could be a hazard to air navigation because after sighting it, the pilot may not have the opportunity to safely circumnavigate or overfly the structure.

Handbook ¶6-3-8(c)(2) (Addendum 22). Similarly:

11

> Proposed or existing structures potentially have the greatest impact in those areas where VFR operations are conducted when ceiling and/or visibility conditions are at or near VFR weather minimums. Any structure that would interfere with a significant volume of low altitude flights by actually excluding or restricting VFR operations in a specific area would have a substantial adverse effect and may be considered a hazard to air navigation.

*Id.* ¶6-3-8(b)(2) (Addendum 21).

## 2.     Evaluating Adverse Impact on Radar

Structures can also create hazards based on their effects to radar.

> The physical presence of a structure and/or the electromagnetic signals emanating or reflecting there from may have a substantial adverse effect on the availability, or quality of navigational and communications signals, or on air traffic services needed for safe operation of aircraft.

Handbook ¶6-3-10(c) (Addendum 31). The Handbook discusses adverse effects to Air Route Surveillance Radars (ARSR) and Airport Surveillance Radars (ASR) and explicitly acknowledges that: "Wind turbines are a special case, in that they may cause interference up to the limits of the radar line of sight." Handbook ¶6-3-10(c)(4) (Addendum 31-32).

In December 2010, FAA issued *Guidelines for Evaluating Wind Turbine Impacts to Radars* (Guidelines). R.55 at 3 (J.A. __). The Guidelines require FAA's Technical Operations Division (Tech Ops) to first identify whether the turbine is within line-of-sight of an air traffic control (ATC), and then examine the

distance between the radar and the turbine. *Id.* at 5 (J.A. __).  All turbines less than 6.5 nautical miles (nm) from a radar require a detailed analysis. *Id.*

Even if a turbine is more than 6.5 nm from a radar, however, it still requires detailed study if it is within radar line-of-sight and also within a "coordination zone" (*i.e.*, an area where the possible consequences of wind turbine effects are high). *Id.*  As the Guidelines explain:

> If the effect happens to be in an area where few aircraft are expected, then the effect consequence would be low, the overall risk would be manageable, and the wind turbines could be allowed.  If, however, this effect is in Class B airspace, then the effect consequence would be high, and the overall risk would be severe (there would be a 'substantial adverse impact' in the language of FAA Order 7400.2).

R.55 at 3 (J.A. ___).  The Guidelines define "coordination zones" to include areas within 4 nm of a Victor airway[2] or within 20 nm of an airport that has instrument approaches.  *Id.*  If FAA determines that effects are present, FAA must identify the potential effects in a table and indicate that the proposal "could create a substantial adverse effect."  R.55 at 5, 7 (J.A. __, __).

---

[2] "Victor airways" are pre-determined IFR routes. *E.g.,* R.53 at 3 (J.A. __) (depicting Victor airways over Nantucket Sound).

II.    **FACTS OF THE CASE**

A.    **The Parties and the Project**

The Project and parties in this case are identical to *Town of Barnstable*.  The Town is located on the southern shore of Cape Cod, Massachusetts; it owns and operates Barnstable Municipal Airport (HYA).  APNS is a tax-exempt organization of private citizens, including pilots, and other organizations that oppose industrialization of Nantucket Sound.  Intervenor CWA proposes to construct 130 Turbines and an electrical service platform in an area of Nantucket Sound known as Horseshoe Shoal.  Each Turbine would be 440' ASL; the Turbines would be distributed in a grid pattern over a 25-square mile area – an area roughly the size of Manhattan. *Town of Barnstable*, 659 F.3d at 30 - 31.

B.    **Aviation Over the Project Area**

The Turbines would be located between the mainland, Cape Cod, Martha's Vineyard, and Nantucket, approximately 7 nautical miles from the runways at HYA, and approximately 12-15 nautical miles from the airports on Martha's Vineyard and Nantucket.  R.53 at 3 (J.A. __).  Nantucket Sound in general, and Horseshoe Shoal in particular, lie beneath a heavily-trafficked flight corridor.  R.48 Ex. 11 (J.A. __).

While there is conflicting data in the Record, even FAA admits that it tracked almost 70,000 flights per year over Nantucket Sound, *i.e*., an average of approximately 185 flights per day, in 2011.  R.56 at 8 (J.A. __).  FAA's 2012 data

14

also identifies a significant number of low altitude operations – up to 9 flights per day – directly over the proposed Project Site. *E.g.*, R.51 at A-9 (J.A. __) (MITRE Report). Moreover, FAA's data likely ***understates*** the total number of flights because its systems "are intended to capture flights that are under positive control of the FAA ***which does not include all VFR flights***" such as aircraft that are not equipped with transponders. R.51 at 3 (J.A. __) (emphasis added). A significant portion of VFR flights in the area occur without transponders, and therefore likely are not captured by FAA's analysis. *E.g.,* R.37, Item 1112 Ex. 45 ¶16 (Approximately 20% of flights at HYA and a large portion of other flights at nearby airports operate without transponders.).

Approximately two-thirds of flights in the region are concentrated in the summer months. R.35A at 4 (J.A. __); *see also* R.48 Ex. 11 (J.A. __) (FAA Manager, Cape Terminal Radar Approach Control Facility (TRACON) comment: "During summer this area is very congested"). These flights include commercial operations and private general aviation operations, many of which operate at relatively low altitudes. *E.g.,* R.48 Ex. 11 (J.A. __) (FAA Manager, Cape TRACON comment: "Much of our VFR traffic flies at or below 1500 [feet ASL]").

The weather over Nantucket Sound is frequently cloudy or foggy, resulting in low-visibility and low-ceiling conditions more than 200 days per year. R.37,

15

Item 1112 Ex. 23 (J.A. __).  Weather conditions can change rapidly, particularly in the summer months, with visibility changing from clear skies and unlimited visibility to total obscuration and half-mile visibility with fog in as little as 15 minutes.  R.37 Ex. 8 at ¶ 20 (J.A. ___).  These conditions would require aircraft to either descend below the cloud ceiling to find clear air or switch to IFR if they are so equipped and qualified.  *Id.* at ¶¶ 22-23 (J.A. ___).

Because of the high-volume corridors leading to and from the airports at Barnstable, Martha's Vineyard, and Nantucket, pilots and air traffic controllers have adopted informal flight corridors for instrument-rated aircraft, which includes commercial aircraft.  R.37, Item 1112 Ex. 7 at 5 (J.A. __); R.37, Item 1112 Ex. 20 at 1 (J.A. __).  Those flight corridors begin at approximately 2000' ASL.  R.37, Item 1112 Ex. 7 at 5 (J.A. __).  In addition, there are low-altitude flight paths between 500' and 1000' ASL over Horseshoe Shoal for VFR aircraft to use in poor weather conditions.  R.37 Item 1112 Ex. 20 at 1 (J.A. __).

## C.    The Impact of the Turbines on Aviation

### 1.    The Turbines Would Impact VFR Operations

Regularly-occurring VFR operations would be forced to change course and/or altitude if the Project is built.  *Town of Barnstable*, 659 F.3d at 35 (noting affected flights at 4.5 times the "threshold of significance").  *See also* R.56 at 7 (J.A. __) (2012 Determinations document 427 flights at altitudes at and below 949

feet directly over the proposed Project area in a 9-month period that would be impacted); R.56 at 6 (J.A. __) ("some aircraft operating under VFR may have to alter their altitude or route"); R.37, Item 1112 Ex. 3 at 1 (J.A. __) (22 low altitude flights would have been affected on July 3, 2008, and 14 flights would have been affected on July 14, 2007).

VFR traffic will have to circumnavigate the Turbines during the "frequent periods of marginal VFR weather experienced in this area." R.35A Att. 4 at 5 (J.A. ___) (2010 Determinations). Local pilots explain that VFR pilots will face real problems in marginal VFR conditions when faced with the inherently conflicting obligations to descend to avoid the clouds, but also to remain at least 500' above the 440-foot tall Turbines. *E.g.* R.37, Item 1112 Ex. 24 at 2 (J.A. ___). This could be particularly difficult over the proposed Project because weather conditions in Nantucket Sound can change abruptly, often forcing pilots to descend rapidly to get under the clouds, creating a clear risk of collision with the Turbines during foggy conditions. R.37, Item 1112 Ex. 7 at 4 (J.A. ___). This is not merely an issue of maintaining the correct altitude; it is a fundamental issue of safety because the Project would require pilots to choose between the inherently unsafe options of flying low to avoid cloud cover but risking a collision with a Turbine or flying high enough to avoid the Turbines but losing visibility due to cloud cover. *Id.*; R.37, Item 1112 Ex. 21 at ¶ 20 (J.A. __).

The Turbines could also affect arrivals into, and certain departures from, HYA. For example, VFR flights departing off of Runway 24 at Nantucket Airport typically turn right over Nantucket Island and then head north, directly skimming the proposed Project site. If the Turbines were constructed, pilots on this path may need to increase their departure climb gradients to avoid the eastern edge of the Project. Conversely, pilots approaching HYA may have to change course to remain clear of the Turbines. R.37, Item 1112 Ex. 21 ¶32 (J.A. __).

## 2.  The Turbines Would Impact IFR Operations

There are also a substantial number of IFR operations in the area where the Turbines would be built. *E.g.*, R.37, Item 1112 Ex. 25 (J.A. __). There are three designated low-altitude Victor airways adjacent to the proposed Project. R.53 at 3 (J.A. ___). Although the Project would not affect the use of these airways directly, it would force the lower altitude VFR traffic into, or immediately below those airways. R.37, Item 1112 Ex. 7 at 5 (J.A. __). This compression "would force the rerouting of aircraft into narrow, concentrated flight corridors, reduce air traffic dispersion horizontally and vertically, push more VFR aircraft into [or very close to] IFR corridors, and reduce altitude separation for opposite direction traffic." *Id*. Such compression would also overload an already overburdened IFR system, causing increased delays and inefficient routings. *Id*.; R.37, Item 1112 Ex. 20 at 2

18

(J.A. ___).  The manager of FAA's Cape TRACON identified this compression effect as a "serious" concern, stating:

> There are a large number of aircraft that request VFR advisories in this area, as they are operating over the ocean.  The reduced capability to provide low altitude advisories would limit these customers to flying at a higher altitude (not always possible VFR), or flying without the benefit of the radar advisories and over-water watch.  Again, during the summer, this area is very congested.  Customers request the service due to the high volume of traffic and the amount of over-water flight. This could lead VFR aircraft to fly at higher altitudes, creating an increased risk of conflict with IFR aircraft.

R.48 Ex. 11 (J.A. ___).

### 3.    The Turbines Would Impair Airport Efficiency and Capacity

The Project "would reduc[e] the effective capacity of the [three Cape and Island] airports by forcing different aircraft types with different speeds into a single corridor with in-trail spacing requirements, limiting airfield capacity of the capacity of the ATC system."  R.37, Item 1112 Ex. 7 at 5 (J.A. ___).  The result would be increased cancellations and extremely long delays.  R.37, Item 1112 Ex. 3 at 2 (J.A. ___); *see also* R.48 Ex. 11 (Cape TRACON manager comment: "During IFR weather and/or the heavy summer traffic, the delays could become quite extensive").  These delays and cancellations will have concrete, negative impacts on the Town by reducing landing fees, fuel sales and other airport

19

revenues, and by increasing the financial burden on the Town to maintain and improve HYA.  R.37, Item 1112 Ex. 45 ¶26 (J.A. __).

Moreover, when visibility decreases, and ATC workload is higher, FAA air traffic controllers increase the required distance between aircraft.  R.37, Item 1112 Ex. 21 at ¶¶26, 28 (J.A. __-__).  For example, on Memorial Day weekend 2010, ATC increased the spacing from three miles to a 10 mile in-trail separation requirement causing Island Airlines' commercial operations between HYA and Nantucket Airport to run approximately 3 hours late.  *Id.*  Because the Project will force more aircraft into less airspace, these delays can be expected to increase as a result of the Project.

### 4.  The Turbines Would Impact Existing Radar Facilities

The Turbines would also interfere with the operation of local radar facilities. Wind turbines interfere with the operation of radar facilities when located in line-of-sight.  R.52 at 1 (J.A. __); Handbook ¶6-3-10(c)(4) (Addendum 31-32).  The Project would be within line-of-sight of three existing radar facilities: the long-range radar North Truro Air Force Station (the Truro ARSR-4), the radar at Otis (the Otis or FMH ASR-8), and the radar at Nantucket Airport (Nantucket ASR-9). R.53 at 6 (J.A. __); *id.* at 3 (J.A. __) (map).

Studies by FAA and others have detailed myriad ways in which the Turbines would interfere with the operation of these radars.  FAA's 2009 report, *Impact*

*Study of 130 Offshore Wind Turbines In Nantucket Sound* (2009 Radar Report), identified multiple adverse impacts to the Otis ASR-8, the Nantucket ASR-9, ***and*** the Truro ARSR-4, including "clutter" (*i.e.,* non-aircraft returns appearing on the radar screen); reduced probability of detection to levels below FAA minimums; "shadowing" (*i.e.*, blocking the radar from detecting objects behind the Turbines); reduced tracking capability for aircraft without transponders (which include a substantial proportion of aircraft over Nantucket Sound); and track "seduction" (*i.e.*, dropped radar tracks when the radar cannot distinguish an aircraft from a Turbine). R.53 (J.A. __). The 2009 FAA Radar Report identified a number of recommendations to mitigate these known adverse effects. *Id.* FAA's 2010 report, *Surveillance Engineering Study: Testing the FMH ASR-8 to Predict the Effects of the Cape Wind Wind Turbine Project* (2010 Radar Report), also concluded that the Turbines would cause significant adverse effects to the ASR-8 and recommended a series of mitigation measures. R.54 at 16-17 (J.A. __).

### D. Project History

CWA has been pursuing the Project for almost a decade, primarily by seeking a lease of the Project area from the Department of the Interior Minerals Management Service (MMS, which office has since been replaced by the Bureau of Ocean Energy Management or BOEM) and related permits from the Army

21

Corps of Engineers and other agencies.  R.37, Item 1112 Ex. 47 (J.A. __) (MMS

Record of Decision).

### 1.    The 2010 Determinations

On May 17, 2010, FAA issued Determinations of No Hazard for the 130

proposed Turbines.  R.35A Att. 4 (J.A. __).  In the 2010 Determinations, FAA

concluded that none of the Turbines exceeded obstruction standards or would

require a change to any IFR procedure, but FAA conducted detailed aeronautical

studies of the Turbines because "each of the 130 wind turbines were identified as

having an adverse effect on the use of air navigation facilities or navigable

airspace."  *Id*. at 4 (J.A. __).

With respect to radar interference, FAA found that the Turbines would

create adverse impacts to the Otis ASR-8 radar, but concluded that the known

impacts could be addressed by implementing a tiered mitigation plan.  First, CWA

would pay for the installation of a TDX-2000 post-processor, which FAA asserted

would filter out interference from the Turbines and allow the ASR-8 to accurately

track aircraft.  *Id*. at 6.  However, in the event that the TDX-2000 upgrade proved

unsuccessful, FAA also required CWA to place $15 million in escrow to pay for

installation of a new ASR-11 radar system to replace the existing ASR-8.  *Id*.  FAA

acknowledged that even the ASR-11 may not work, and was prepared to close the

airspace to aircraft without transponders.  R.54 at 17 (J.A.__) ("[a]s a last resort,

22

[FAA should] revise the Cape TRACON airspace and procedures to restrict air traffic in the wind turbine area to only aircraft with beacon transponders").

With respect to VFR operations, FAA concluded that because no Turbine exceeded any Part 77 obstruction standard, no Turbine could be a hazard.  R.35A Att. 4 at 7 (J.A. __).

Petitioners challenged the 2010 Determinations, first through FAA's administrative process, and ultimately before this Court.

### 2.    The 2011 Court Opinion

On October 28, 2011, this Court vacated the 2010 Determinations.  *Town of Barnstable*, 659 F.3d 28.  The Court held that FAA erred by "[i]mproperly relying solely on §6-3-8(c)(1)" of the Handbook to conclude that the Turbines could ***only*** be hazards if they were also obstructions.  *Id.* at 35.  First, the Court noted that FAA had "read[] into [Section 6-3-8(c)(1)] a non-existent 'only,'" which impermissibly limited FAA's analysis to structures that exceeded an "obstruction" standard.  *Id.*  Second, the Court held that other provisions in the Handbook require FAA to consider the impacts of a structure on VFR operations ***without regard to the obstruction standards***.  *Id.* at 35-36 (*citing* Handbook ¶¶6-3-3(b) and 6-3-8(b)(2)).

The Court identified at least two ways in which the Turbines ***would*** have a substantial adverse impact on VFR operations: (1) low-altitude VFR flights

regularly crossed the project area and would be forced to change course or altitude to avoid the Turbines; and (2) the number of affected operations was "more than four and a half times the one flight per day that §6-3-4 sets as the threshold of significance." *Id.* at 35-36. The Court also recognized that "inclement weather" could compress aircraft into lower altitudes creating the potential for flying within 500' of the Turbines in violation of 14 C.F.R. §91.119. *Id.* at 36. Although the Court did not prejudge the outcome of FAA's analysis on remand, the Court highlighted the fact that FAA's discretion to avoid issuing hazard determinations for this Project is very limited, stating that:

> [a]ny sensible reading of the handbook, and of §6-3-8(c)(1) in particular, would indicate there is more than one way in which the wind farm can pose a hazard to VFR operations. Indeed, other sections of the handbook, especially when read in light of some of the evidence noted above, suggest that the project may very well be such a hazard.

*Id.* at 36.

Because it vacated FAA's decision solely on the grounds of FAA's flawed VFR analysis, the Court's ruling did not reach or discuss Petitioners' other challenges.

### 3.    The 2012 Aeronautical Studies

In January 2012, CWA re-filed Notices of Proposed Construction for the identical Project examined in the 2010 Determinations. R.27 (J.A. __). In

response, FAA opened new aeronautical study case numbers for the 130 Turbines (2012-WTE-322-OE through 2012-WTE-451-OE, or the 2012 Aeronautical Studies). *Id*.

On February 10, 2012, FAA sought comments on the 2012 Aeronautical Studies, stating:

> These structures do not exceed obstruction standards. However, in view of [the] decision in *Town of Barnstable* …, the FAA finds that even though the proposed structures do not exceed the obstruction standards in part 77, circumstances warrant the circularization of these cases for public comment.
> …
> Therefore, this public notice is issued to collect information on potential impacts on VFR operations.

R.30 at 1, 3 (J.A. __, __) (emphasis added). Petitioners filed comments on ***all*** of the potential adverse effects in order to provide FAA with the information it needed to conduct a thorough analysis of how the Turbines would affect air navigation facilities and the use of the navigable airspace as required by statute, the Handbook, and *Town of Barnstable*. R.37 (J.A. __) (March 15 comments); R.49 (J.A. __) (July 2 supplemental comments).

### 4.     The 2012 Determinations

On August 15, 2012, FAA issued Determinations of No Hazard for the Turbines, concluding there was no need to analyze whether the Turbines would have an adverse effect on VFR operations because none of the Turbines would

exceed an obstruction standard or would have a physical or electromagnetic radiation effect on the operation of air navigation facilities.  R.56 at 3 (J.A. __). However, FAA stated that it had gathered "additional data" on VFR traffic in the area of the proposed Project "specifically to respond to the court's concern raised in *Town of Barnstable, Mass. v. FAA*."  *Id*. at 3-4 (J.A. __).  The only new data apparent in the Record is the 2012 study by the MITRE Corporation entitled *VFR Traffic Analysis for the Proposed Horseshoe Shoal Wind Farm* (MITRE Report). R.51 (J.A. __).  The MITRE Report, which looked only at VFR traffic with transponders, counted approximately 427 VFR flights over the Project area at altitudes below 950 feet, and an additional 356 VFR flights over the Project area at altitudes between 950 – 1,049 feet during a nine-month period.  R.51 at 7-9 (J.A. ___).  The 2012 Determinations acknowledge that some of these operations may have to circumnavigate around the Turbines.  R.56 at 9 (J.A. __).  Nevertheless, FAA once again determined that the Turbines could not be hazards because none of the Turbines exceeds an obstruction standard.  *Id.* at 6 (J.A. ___).

With regard to radar impacts, FAA changed its position that the Turbines *would* interfere with the Otis ASR-8 concluding that the 2011 installation of a TDX-2000 post-processor at the Otis ASR-8 will "address indentified radar issues" and "reduce unwanted returns from the wind turbines."  R.56 at 5 (J.A. ___). However, FAA continued to recognize that the TDX-2000 upgrade may be

inadequate; the 2012 Determinations still required CWA to post a $15,000,000 bond "in the event that the TDX-2000 modification … does not fully mitigate the radar interference/clutter issue." R.56 at 10 (J.A. __).

## SUMMARY OF ARGUMENT

The 130 Cape Wind Turbines, each 440 feet tall, would occupy a 25 square-mile area of Nantucket Sound that is regularly and frequently used by aircraft. If built, the Project would force regularly-occurring aircraft operations to change course or altitude, would create an inherent safety risk, would force changes in VFR and IFR procedures and operations, and would derogate airport capacity by increasing delays. The Turbines would also impair the ability of the three primary radar facilities near the Project to accurately track aircraft in the area, thus putting pilots and passengers at risk. Despite these adverse effects, FAA issued Determinations of No Hazard finding that the Turbines would not impair the use of the navigable airspace or air navigation radar facilities. FAA's decision should be reversed for three independent reasons.

First, this Court in *Town of Barnstable* held expressly that FAA cannot refuse to study adverse effects on VFR en route operations just because the Turbines would not exceed FAA's "obstruction" standards, and directed FAA to study the safety risks posed by the Turbines on remand. The 2012 Determinations violate the remand, as well as the Handbook and 49 U.S.C. §44718(b), by again

27

finding that the Turbines would not have an adverse aeronautic effect solely because the Turbines would not exceed an "obstruction" standard.  Second, FAA violated its obligation to prevent interference with nearby radar facilities by relying on limited and unproven mitigation measures.  That decision is arbitrary and capricious and is not supported by substantial evidence in the Record because the mitigation measures: (1) are not proven (even FAA anticipates the possibility that its mitigation will not work); (2) address impacts to only one of the three radars that would be affected by the Turbines; and (3) do not address all of the ways in which FAA itself recognized that the Turbines would interfere with the existing radar.

Third, FAA violated NEPA by failing to study the environmental impacts of the Turbines.

## STANDING

Pursuant to Circuit Rule 28(a)(7), the Town and APNS state they have standing for the same reasons the Court determined they had standing to challenge the 2010 Determinations.  *Town of Barnstable*, 659 F.3d at 31-34.  In *Town of Barnstable*, FAA acknowledged the adequacy of Petitioners' injury claims.  *Id.* at 31.  None of the facts regarding injury has changed, so the Town and APNS continue to have standing to assert this second round of challenges to the same project.  Moreover, APNS continues to have organizational standing because: (1)

28

its members would have standing; (2) the interests at stake are relevant to APNS's purpose, which is the preservation of Nantucket Sound; and (3) neither the claims asserted by APNS nor the relief sought require the participation of individual members. *Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc*, 528 U.S. 167, 181 (2000).

To remove any doubt, the Town and APNS provide new declarations from Roland Breault, Airport Manager of HYA, and Audra Parker, Director, APNS, setting forth current information showing that the Town and APNS would suffer the same injuries that were sufficient in *Town of Barnstable.* Declaration of Roland Breault at ¶¶8-10 (Addendum 53-54); Declaration of Audra Parker at ¶¶4-6 (Addendum 56). The Town and APNS also have standing pursuant to 49 U.S.C. §46110(a) because they "disclos[e] a substantial interest" in an order issued by FAA. (Addendum 13).

This Court previously held that, despite the fact the FAA is not expressly permitting the project, the Town and APNS satisfied the causation and redressability requirements because the Department of Interior has conditioned construction of the Turbines on FAA making a no hazard determination. *Id.* at 34 (*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).[3]

---

[3]    *See also* R.37, Item 1112 Ex.47 (MMS Record of Decision) at 24 (J.A. __) ("CWA could not begin construction until CWA's receipt of the FAA's final determination on whether a hazard exists and compliance with any resulting

Because none of the terms of CWA's Lease or Interior's approval thereof has changed, it is more than "likely" that granting the relief the Town and APNS seek here (vacating FAA's 2012 Determinations) would redress the injuries they would suffer if the Turbines were built. Accordingly, for the same reasons set forth in *Town of Barnstable*, the Town and APNS have standing to bring this Petition. 659 F.3d at 31-34.

## ARGUMENT

## I.    STANDARD OF REVIEW

FAA's decisions under 49 U.S.C. §44718 and Part 77 are reviewed under traditional APA standards and must be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *D&F Afonso Realty Trust v. FAA*, 216 F.3d 1191, 1194 (D.C. Cir. 2000). FAA's factual findings must be set aside if they are "not supported by substantial evidence in the record as a whole." *BFI*, 293 F.3d at 532 (internal quotations omitted); *see also* 49 U.S.C. §46110(c) (FAA factual determinations must be supported by substantial evidence) (Addendum 13). Further, an agency's "abandonment of its own established procedure and its lack of reasoned analysis on the record constitute arbitrary and capricious agency action in violation of the law." *D&F*, 216 F.3d at

mitigation measures.").

1196-97; *see also id*. at 1195 (court "must strike down agency action if the agency failed to consider relevant factors or made a clear error of judgment").

Finally, when an agency decides a matter following a remand, the agency must implement the spirit and the letter of the mandate.  *See City of Cleveland v. Fed. Power Comm'n*, 561 F.2d 344, 346 (D.C. Cir. 1977).  The agency is bound to follow the Court's determinations of matters of law.  *Id.*

II.   **IN VIOLATION OF THE CLEAR INSTRUCTIONS OF THIS COURT ON REMAND, THE PLAIN TERMS OF ITS BINDING HANDBOOK, AND THE CONTROLLING STATUTE, FAA IGNORED EVIDENCE IN THE RECORD SHOWING THAT THE TURBINES WOULD HAVE A SUBSTANTIAL ADVERSE IMPACT ON VFR OPERATIONS**

The Court in *Town of Barnstable* held that FAA had misapplied its own Handbook by relying solely on the notion that a structure cannot be a hazard if it is not also an "obstruction."  659 F.3d at 35.  Even a cursory review of the 2012 Determinations reveals that FAA all but thumbed its nose at the Court's ruling in *Town of Barnstable*, failed to perform the safety analysis the Court required, and repeated the same errors that led the Court to vacate the 2010 Determinations. First, FAA simply reiterates its position that "there is no need to analyze whether the [Turbines] would have an adverse effect, because the [Turbines] do not exceed obstruction standards."  R.56 at 3 (J.A. __); s*ee also id.* at 6 (J.A. __).  Indeed, FAA incorrectly paraphrases the Handbook to explicitly ***include*** the non-existent "only" that the Court found impermissible.  *Id.* at 6.  Second, FAA simply failed –

31

if not refused – to perform the substantive safety analysis as directed by the Court, once again "cut[ing] the process short" and therefore "never calculate[ing] the [safety] risks in the first place." *Town of Barnstable*, 659 F.3d at 36.  Because FAA failed to follow this Court's clear mandate on remand, and once again failed to adhere to its regulatory and statutory duties, the 2012 Determinations should be vacated.

### A.     FAA Again Relied On Its Erroneous View That A Structure Can Only Be A Hazard If It Is An "Obstruction"

FAA must issue Determinations of Hazard because the Turbines would have a "substantial adverse effect" as FAA itself defines the term.  The Turbines would have an adverse effect pursuant to Handbook ¶6-3-3(b) because they would require VFR operations to "change [their] regular flight course or altitude."  (Addendum 19); *see also* R.56 at 6 (J.A. ___) (2012 Determinations conclude that "some aircraft … may have to alter their altitude or route ...").  This would affect a significant volume of aeronautical activity pursuant to Handbook ¶6-3-4 (Addendum 19-20) because one or more operations per day would be affected.  *Id.* at 7 (J.A.___); R.51 at 7 (J.A. ___) (MITRE Report).  Accordingly, pursuant to FAA's own standards, the Turbines would have a "substantial adverse effect," Handbook ¶6-3-5 (Addendum 20), and must be deemed hazards, Handbook ¶7-1-3(e) (Addendum 37).

Repeating the error of the 2010 Determinations, FAA asserts that the Turbines cannot be hazards because they do not exceed an "obstruction" standard. R.56 at 3 (J.A. __).  Without acknowledging *Town of Barnstable*, FAA asserts that:

> [P]aragraph 6-3-8(c)(1) [of the Handbook] states that a structure would have an adverse effect upon VFR en route air navigation ***only*** if its height is greater than 500 ft. above the surface at its site ***and*** within two statute miles of a regularly used VFR route.

R.56 at 6 (J.A.__) (emphasis added).  In so doing, FAA blatantly disregards the Court's unambiguous legal ruling that FAA may not "***read[] into [Section 6-3-8(c)(1)] a non-existent 'only'***", 659 F.3d at 35(emphasis added).  FAA further ignores the Court's ruling that neither Paragraph 6-3-8(c)(1) nor the entire structure of the Handbook permit FAA to fail to analyze adverse effects just because a structure does not exceed an obstruction standard.  *Id.* at 35-36.

FAA's notion that being an "obstruction" is a necessary predicate to being a "hazard" tainted its entire analysis, leading it to prejudge the outcome of the 2012 Determinations.    Even when publishing its Circularization Notice, FAA announced:

> None of the turbines exceed any 14 CFR Part 77, Subpart C obstruction standard nor would they require a change to any instrument flight procedure.  ***None of the turbines would have an adverse effect on the use of air navigation facilities or navigable airspace*** ….

R.30 at 3 (J.A. __) (emphasis added).  This statement underscores FAA's

indifference to this Court's direction to conduct "meaningful review" on remand notwithstanding the fact that the Turbines would not exceed an obstruction standard.  *See* 659 F.3d at 36.

One explanation for FAA's repeated failure to follow correctly its own procedures, and its refusal to follow this Court's direction, is that FAA was under considerable political pressure to make a no hazard determination without regard to the actual effect of the Turbines on aviation safety.  *E.g.*, R.49 Att. A at Ex. 8 (J.A. __) (FAA PowerPoint stating: "The Administration is under pressure to promote green energy production.  It would be very difficult politically to refuse approval of this project.").  This pressure clearly affected FAA's willingness to report honest safety concerns.  *Id.* at Ex. 9 (J.A. __) ("Who is willing to go tell the White House that we are halting wind development because there might be wake turbulence or micro climate effects?").

Whatever the cause, FAA breached its independent obligation under Section 44718 and the Handbook to study the safety impacts of the Turbines.  This failure, coupled with FAA's open disregard of the Court's specific rulings, and disrespect for the spirit of the Court's ruling, is grounds to vacate the 2012 Determinations. *See Am. Airlines, Inc. v. Transp. Sec. Admin.*, 665 F.3d 170, 176 (D.C. Cir. 2011) (failure to provide analysis required by statute violates the APA).

FAA appears to take the position that its decision is consistent with *Town of Barnstable*, because the Court "assumed" that FAA was correct when it asserted that in order to find "adverse effects" under Handbook Paragraph 6-3-3, the criteria of both the first sentence ***and*** the second sentence (through one or more of its subsections) must be satisfied.  *See* 659 F.3d at 35 n.1.  Following interpretation, FAA now appears to take the position that it does not need to examine VFR issues under the second sentence of Paragraph 6-3-8 because the Turbines are neither obstructions nor do they create radar interference under the first sentence.  R.56 at 3 (J.A. __).[4]  That argument fails for two reasons.

First, in *Town of Barnstable,* the Court merely "assumed" FAA's position was valid and gave FAA "the benefit of the doubt."  659 F3d at 35 n.1.  But the Court did not ***rule*** on the validity of FAA's position because in the 2010 Determinations at issue in *Town of Barnstable*, FAA had conceded that the

---

[4]    In an apparent attempt to show that its decision is not dependent on the obstruction standards, the 2012 Determinations declare that, according to FAA's "long-standing policy," "even if the proposed wind turbines exceeded an obstruction standard …, [they] would not have an adverse impact to VFR operations, because none of the wind turbines exceed 500 feet AGL."  R.56 at 6 (J.A. __).  This statement is circular nonsense.  In the Project area, an "obstruction" is defined as a structure 499' or taller.  14 C.F.R. §77.17(a)(1) (Addendum 44).  Thus, FAA is relying on the circular argument that even if the Turbines exceeded an obstruction standard they would not have an adverse impact because they do not exceed an obstruction standard.  In any event, FAA never explains why the fact that the Turbines are less than 500' ASL necessarily means the Turbines *cannot* have an adverse impact.

Turbines would interfere with radar, thereby independently satisfying the first sentence of Handbook ¶6-3-3. *Id.* at 35. Because FAA does not make that concession here, and concludes (erroneously, as discussed below) that the Turbines would not affect radars, the issue is now squarely presented.[5]

Second, carried to its logical conclusion, FAA's position is that a structure that is not an obstruction can ***only*** be a hazard if it both interferes with radar ***and*** would have an adverse effect pursuant to one of the subsections of the second sentence of Paragraph 6-3-3. This is manifestly contrary to Congress' command that FAA study the impact of structures that "may result in an obstruction of the navigable airspace ***or*** an interference with air navigation facilities and equipment ***or*** the navigable airspace." 49 U.S.C. §44718(b)(1) (Addendum 38) (emphasis added). FAA's position would impermissibly replace the "ors" with "ands" and result in a process plainly at odds with Congress's intent. *See Ass'n of Private Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 451 (D.C. Cir. 2012) ("Under principles of statutory construction, 'terms connected by a disjunctive [should] be given separate meanings, unless the context dictates otherwise; here it does not.'") (*citing In re Espy,* 80 F.3d 501, 505 (D.C. Cir.1996) (per curiam)

---

[5]    If the Court concludes that FAA erred in finding no adverse effects to radar facilities, the VFR issue would be presented even under FAA's interpretation.

36

("[A] statute written in the disjunctive is generally construed as 'setting out separate and distinct alternatives.'" (citation omitted))).

Moreover, once FAA finds the possibility of one of the three kinds of impacts identified in the statute, it must "decide the extent of *any* adverse impact on the safe and efficient use of the airspace, facilities, or equipment."  49 U.S.C. §44718(b)(1) (Addendum 38) (emphasis added).  Congress' use of the all-inclusive term "any" prohibits FAA from failing to consider some adverse impacts.  This is reflected further in Sections 44718(b)(1)(A)-(E), which do not limit the scope of analysis base on the cause of the interference.  (Addendum 38-39).  As the Court held in *Town of Barnstable*, and as the Record here confirms, the Turbines *would* have an adverse impact pursuant to Handbook ¶6-3-3(b) because they would force VFR operations to alter their course or altitude.  659 F.3d at 35-36.  Under Section 44718(b), therefore, FAA cannot refuse to analyze the extent of those impacts based on hyper-technical FAA policy.  *See* 659 F.3d at 36; *compare Greater Orlando Aviation Auth. v. FAA*, 939 F.2d 954, 960 (11th Cir. 1991) (finding that FAA's "first-come-first-served" rule under its Part 77 regulations was "unduly technical and restrictive and [ ] contrary to the policy underlying the statute and regulations").

Finally, it simply makes no sense to ignore the actual impact of a structure on VFR operations just because it would not *also* affect radar facilities.  If a

structure poses a danger to VFR operations, the extent of that danger should be analyzed carefully.  The degree of that danger is not decreased just because the structure does not also create other safety risks.  Congress recognized that common sense approach and required FAA to analyze structures that create **any** safety risk, not just structures that create multiple safety risks.  49 U.S.C. §44718(b).  Once again FAA's position is inconsistent with Congress' commands, with the structure and substance of the Handbook, and with common sense.  Accordingly, it should be rejected.

### B.    FAA Failed To Conduct The Safety Analysis Mandated By The Court

FAA purports to comply with the Court's mandate, but its efforts reveal that FAA ignored both the letter and the spirit of the Court's decision by treating the additional analysis required on remand as a superficial formality.  First, FAA repeatedly insists that additional analysis was unnecessary because the Turbines would not be obstructions.

> The FAA found it appropriate to study VFR operations in the vicinity of the proposed wind farm, notwithstanding the fact that these structures are less than the obstruction criteria, in order to provide additional facts in view of the holding in *Town of Barnstable, Mass. v. FAA*.  The inclusion of this information in the administrative record does not change the fact that neither of the criteria necessary for determination of an adverse effect has been met.

R.56 at 9-10 (J.A. ___).  *See also id.* at 6 (J.A. ___) ("[b]ased on the specific facts

presented [Turbines not exceed 500' ASL], no VFR analysis is required in this case.  Nonetheless, to address concerns raised by the court in *Town of Barnstable*, the FAA requested Mitre to conduct a study of VFR operations over the wind farm polygon").  Despite the Court's clear ruling that a safety analysis was required, FAA assumed that the Court-ordered analysis was immaterial to its analysis, once again "cut[ing] the process short in reliance on a misreading of its handbook."  659 F.3d at 36.

Second, FAA's analysis failed utterly to address the safety issues identified by the Court and mandated by the Handbook.  The only additional information FAA collected in response to the Court's order is the MITRE Report, but having collected this information, FAA essentially ignored it.  R.51 (J.A. ___).  The MITRE Report clearly documents that a significant number of VFR flights would be affected by the Project.  R. 51 at 9 & A-1 – A-10 (J.A. __, __-__) (427 affected flights over study period; as many as 9 flights affected on a single day).  In fact, the MITRE Report *under counted* operations because it did not count the substantial number of aircraft that are not equipped with transponders.  R.56 at 6 (J.A. ___); *see also* R.37, Item 1112 Ex. 45 at ¶16 (J.A. __) (a substantial number of aircraft operating in the area are not equipped with transponders).[6]  Nonetheless the Report

---

[6]    The Record also contains radar track data of aircraft with and without transponders, indicating a *higher* number of operations over the Project area.  659 F.3d at 35 (noting operations of more than 4.5 times the threshold of significance).

provides no analysis of the safety risks posed by the Turbines, of how the Turbines would affect VFR flights in periods of low visibility and poor weather, or how the route and altitude diversion caused by the Turbines would affect other traffic in the area.

In the 2012 Determinations, FAA turns a blind eye to the MITRE Report's confirmation that a significant number of VFR flights would be adversely affected by the Turbine and fails to use that information to inform any analysis or conclusions of the safety risks posed by the Turbines. *See* R.56 at 7 (J.A. ___). This failure is simply unacceptable. FAA ignores the substantial evidence in the Record demonstrating numerous ways the Turbines would impair aviation safety,[7] including specifically, FAA's own evidence of collision risk,[8] how displaced VFR operations would affect other VFR and IFR operations,[9] how the Turbines would

---

*See also* R.37, Item 1112 Ex.42 at 6 (J.A. __) (10 VFR flights below 500' ASL flew over the Project site on July 14, 2007). FAA made no attempt to adjust the results of the MITRE Report to account for aircraft without transponders.

[7] *Supra*, pages 16-21.

[8] *See* R.56 at 9 (J.A. __) (VFR flights will need to alter course to avoid Turbines); R.48 at Ex.16 (J.A. __) ("I don't think air traffic [control] could keep a low flying search-only VFR from flying into a wind turbine."). *See also* 659 F.3d at 35-36 (noting apparent safety issues).

[9] *See* R.48 at Ex. 11 (J.A. __) ("[m]uch of our traffic flies at or below 1500 [feet] … a large number of aircraft [ ] request VFR advisories in this area, as they are operating over the ocean. The reduced capability to provide low altitude advisories would limit these customers to flying at a higher altitude …. This could lead VFR aircraft to fly at higher altitudes, creating an increased risk of conflict with IFR aircraft.").

affect search and rescue operations, how the Turbines would impair airport capacity or operations,[10] or what the safety risks and issues are, as directed by the Court, and required by the statute.  659 F.3d at 36; 49 U.S.C. §44718 (Addendum 38-39).  Nor does FAA discuss, or even cite, the issues set forth in Handbook ¶6-3-8(b)(2), which the Court specifically found it was required to do, 659 F.3d at 36, or ¶6-3-8(c)(2), which also applies.[11]  Thus, FAA utterly failed to conduct the kind of safety analysis required by the Handbook and the Court.

The only indication that FAA gave any consideration to specific safety concerns was its response to public comments that "[a]ircraft would have to circumnavigate (change altitude or route) especially during the frequent periods of marginal VFR weather."  R.56 at 9 (J.A. ___).  FAA dismissed those concerns because the Turbines would be marked and lighted.  *Id.*  The only basis FAA provides for that conclusion is a citation to Handbook ¶6-3-8(b)(3), which provides

---

[10]     *See id.* ("During IFR weather and/or the heavy summer traffic, the delays could become quite extensive.")

[11]     FAA also violated the APA by failing to analyze the cumulative impact of constructing the entire project as required by 49 U.S.C. §44718(b)(1)(E) (Addendum 39).  The need to consider the cumulative effects of the Turbines is particularly acute in this case because the large number of structures – 130 Turbines – and sheer size of the Project – 25 square miles – means that a block of airspace covering 25 square miles and extend upward by 940' that is currently used by routine air traffic, would become unavailable.  FAA made a cursory reference to this obligation in the 2010 Determinations, R.35A Att. 4 at 7 (J.A. ___), but fails to make any such mention in the 2012 Determinations.  *See Am. Airlines, Inc.* 665 F.3d at 176 (failure to provide analysis required by statute violates the APA).

that not every structure that penetrates the navigable airspace is a hazard because lighting and marking may allow pilots to see and avoid the structures. FAA further noted that it is not unusual for pilots to adjust course and altitude while flying over Nantucket Sound to remain clear of ferries and boats. *Id.*

This dismissive, conclusory statement is wholly inadequate. The issue is not just whether the Turbines can be seen in clear weather, but whether they can be *avoided* in the real-world conditions over Nantucket Sound. A pilot who is flying at a typical cruising speed (often 140 miles-per-hour) over the Project Site and is forced to descend into the area occupied by the Turbines because of poor visibility conditions will find little comfort that the structures filling the available airspace path are lighted.

The Handbook itself recognizes this safety issue and requires FAA to consider it: "[e]ven if made more conspicuous by the installation of high intensity white obstruction lights, a structure placed in this location could be a hazard to air navigation because after sighting it, the pilot may not have the opportunity to safely circumnavigate or overfly the structure." Handbook ¶6-3-8(c)(2) (Addendum 21). Handbook ¶ 6-3-8(b)(3), upon which FAA relies, does not override ¶6-3-8(c)(2), nor does it provide that a lighted and marked structure can *never* be a hazard. Given the evidence of regular low-altitude flights and frequent periods of poor weather and low visibility in the area of the Turbines, FAA cannot

42

avoid substantive analysis of the risks posed by the Turbines simply by ensuring that they will be lit.

## III.  FAA'S POSITION THAT THERE WOULD BE NO ADVERSE EFFECTS TO EXISTING RADARS IS UNREASONABLE AND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

In the 2010 Determinations, FAA acknowledged that the Turbines would impair the operation of area radars.  *See* 659 F.3d at 35 ("It is undisputed that the project turbines would [ ] have the threshold 'physical or electromagnetic radiation effect on the operation of air navigation facilities'. . . .").  In the 2012 Determinations, FAA again acknowledges that the Turbines would impair the search radar service of the Otis ASR-8 and the Nantucket ASR-9 radars, but concludes that these impacts "[do] not constitute a physical or electromagnetic effect on the operation of … these navigation facilities."  R. 56 at 5 (J.A. ___).  The FAA also concludes that the Turbines "would not affect" the Truro ARSR-4 radar due to the distance and relative elevation of the radar to the Turbines.  *Id.* at 4-5 (J.A. ___).  In reaching these conclusions, FAA relies on mitigation measures that its own professionals acknowledge may not work and ignores other evidence in the Record, including its own experience at other radar sites and the opinions of its experts, further demonstrating that the Turbines will interfere with radars.  Proper consideration of the full Record demonstrates that the 2012 Determinations must be vacated.

43

A. **FAA's Proposed Mitigation For Acknowledged Interference With The Otis ASR-8 Is Insufficient**

1. **FAA's Tiered Mitigation Proposal Would Frustrate Statutory and Regulatory Requirements by Allowing the Turbines to Be Erected *Before* Knowing Whether Radar Interference Can Be Mitigated**

In order to find that the Turbines are not hazards, FAA relies on mitigation measures – the TDX-2000 and the ASR-11 – that will not be known to be effective until *after* the Turbines are built and a hazard exists. Accordingly, FAA has required CWA to post a bond to cover the cost of installing an ASR-11 upgrade for the Otis ASR-8 in the event the TDX-2000 does not work. R.56 at 10 (J.A. ___). Moreover, FAA acknowledges that if the ASR-11 does not work, it would have to close the airspace to aircraft without transponders. R.54 at 17. (J.A.__) ("As a last resort, [FAA should] revise the Cape TRACON airspace and procedures to restrict air traffic in the wind turbine area to only aircraft with beacon transponders.") This is contrary to the express direction of 49 U.S.C. §44718 to identify and mitigate hazards *before* they are built. *ALPA*, 446 F.2d at 242.

As the Acting Manager of the FAA Obstruction Evaluation Office made clear in a March 22, 2010 email:

> It gets problematic to say let's try one thing, and if that does not work, we'll stop everything and revert to plan B. Once development starts on a wind construction site, you can't shut them down when all their resources are allocated for the project and equipment. ***Shutting them***

> *down midstream will create an undue burden on the*
> *developer and could possibly bankrupt them*.

R.48 Ex. 23 (J.A. __) (emphasis added).  In addition to the burden on CWA that is

of such great concern to FAA, FAA ignores the substantial danger to the travelling

public by allowing the construction of structures that will be hazards if, as FAA

acknowledges is a genuine possibility, the mitigation measures do not work.  FAA

cannot ignore acknowledged radar issues in the hope they will not materialize.

*Clark Cnty. v. FAA,* 522 F.3d 437, 442-43 (D.C. Cir. 2008) (vacating

determinations of no hazard for turbines because FAA failed to address

acknowledged radar interference concerns).

Finally, FAA's ultimate solution – to exclude the substantial number of

aircraft without transponders – is a stark admission that the Turbines **would be**

hazards to those aircraft.[12]  FAA fails in its fundamental mission to *protect* current

flight operations if it can only declare a structure not to be a hazard because it has

prohibited the affected operations.  Handbook ¶6-3-1(b) (Addendum 19) ("In the

case of such a conflicting demand for the airspace by a proposed construction or

alteration, the first consideration should be given to altering the proposal."); *id*. ¶1-

---

[12]    Restricting traffic to transponder-only aircraft over the proposed 25 square-mile Project site would also exacerbate the compression of air traffic, which would create a substantial adverse impact itself, as discussed above.  R.37 at 14-15 (J.A. __).

2-1 (Addendum 17) (same).  The notion that FAA may have to ban the flights in order to make those flights safe is patently unreasonable.

At bottom, FAA's "wait, see and hope" approach is precisely the kind of "sheer foolishness" that FAA was admonished to avoid four decades ago.  *ALPA*, 446 F.2d at 242 ("To wait until after the buildings are built to evaluate the FAA's decision-making process on the problem would … be sheer foolishness").  It should be rejected here as well.

### 2.    The TDX-2000 May Not Mitigate The Known Adverse Effects of the Turbines

FAA's conclusion that the Turbines will not adversely affect the Otis ASR-8 radar is based on its view that the recent TDX-2000 upgrade *will* address the acknowledged impacts of the Turbines.  R.56 at 5 (J.A. ___).  This is unsupported by the Record.

First, the risk that the TDX-2000 "fix" may fail is so real that FAA still requires the ASR-11 upgrade as a backup plan.  R.56 at 10 (J.A. __).  FAA cannot insist that the TDX-2000 will resolve interference issues but in the same breath require alternative mitigation in the event the TDX-2000 does not work.  FAA's tiered mitigation plan is a tacit admission that the TDX-2000 upgrade is not sufficient.  FAA fails to explain this inconsistency in the Determinations, in violation of the basic principles of reasoned decisionmaking.  *Cf. Cont'l Air Lines,*

*Inc. v. C.A.B.*, 551 F.2d 1293, 1303 (D.C. Cir. 1977) (reasoned decisionmaking requires an agency to explain apparent inconsistencies within the same decision.).

Second, FAA professionals who evaluated mitigation options have long acknowledged that replacing the existing ASR-8 with an ASR-11 would be "the best option" because simply upgrading the ASR-8 with a TDX-2000 post-processor may not provide sufficient mitigation. R.48 Ex. 18 at 1 (J.A. __); *see also* R.48 at Ex. 19 (J.A. __) ("Tech Ops believes pursuing the ASR-11 at the outset provides the most benefit to both the FAA and Cape Wind"); R.48 Ex. 20 at 9 (J.A. __) ("A recent evaluation by WSA has lead [sic] to a determination that the performance of the ASR-11 over a wind farm is superior than [sic] performance of an ASR-8 paired with a TDX-2000.").

Moreover, FAA documents indicate that the decision to rely on the TDX-2000 (in lieu of requiring the "best option") was based in large part on the cost of upgrading to an ASR-11, rather than on objective assessment of how best to mitigate the acknowledged interference issues. *E.g.,* R.48 Ex. 29 (J.A. __) ("the ASR-11 office has no funding available to support the cost-sharing request"). Putting the economic impact of providing the preferred mitigation measures ahead of an objective assessment of effectiveness subverts FAA's role as guardian of aviation safety.

Finally, FAA has failed to address the substantial evidence in the Record detailing the numerous shortcomings of the TDX-2000.  In addition to the comments of FAA professionals cited above, the performance of the TDX-2000 is untested over a wind farm.  R.48 at Ex. 17 (J.A. __).[13]  Moreover, the Record shows that the TDX-2000 post-processor will not work under saturation conditions, under very low probability of detection, or if the clutter were not sufficiently rejected, and will therefore not effectively resolve line-of-sight radar interference in Nantucket Sound.  R.37, Item 1112 Ex. 40 at 1-2 (J.A. ___-___); R.37, Item 1112 Ex. 41 at 5 (J.A. ___); R.37, Item 1112 Ex. 42 at 3-4 (J.A. ___-___).  In addition, a local air traffic controller notes that although FAA already installed the TDX-2000 upgrade at the Otis ASR-8, the upgrade has not addressed existing interference to that radar.  *E.g.*, R.49 at 4-6 & Ex. D (J.A. __-__ & __) (Affidavit of M. Cool).

**3.    The ASR-11 Also May Not Resolve the Acknowledged Interference Issues**

Step two of FAA's proposed mitigation for the Otis ASR-8 (replacing it with a new ASR-11) is also uncertain (even if it is preferable to the TDX-2000).  R.56 at 10 (J.A. __).

---

[13]    In fact, FAA admits that testing would be useless.  R.48 Ex.18 at 5 (J.A. __) (results of any ASR-8 testing would be inconclusive and would likely yield "little comfort level for the FAA").

First, FAA may not be able to provide an ASR-11 unit when it is needed.  A senior FAA official testified before Congress in June, 2010, that radar units are ***not*** readily available and that relying on the installation of new radar equipment to mitigate the impact of new wind energy projects is often "unacceptable," "unworkable," and "not something that FAA can accommodate."  R.37, Item 1119 Ex. 3 at 4-5 (J.A. ___).  It is patently unreasonable for FAA to rely on a mitigation measure that may not be available to mitigate the impacts of turbines that have already been constructed.

Second, there is substantial evidence that the ASR-11 will *not* solve radar interference caused by the Turbines.  R.48 Ex. 19 at 1 (J.A. __) (FAA Talking Points stating that "not even the ASR-11 will mitigate the clutter completely or in such a way that there will not be occasional loss of detection of … aircraft without transponders").  For example, an ASR-11 that was installed to mitigate wind turbine interference at Travis Air Force Base in California has *not* eliminated the problem.  Radar interference issues remain, and aircraft not equipped with transponders *cannot be detected*.  As a result, Travis has been forced to take "last resort" measures.  It has published MidAir Collision Avoidance pamphlets advising pilots that: "The wind farms southeast of Travis AFB interfere with the Travis ATC radar.  In the area shown above, *if you are not squawking, you cannot be seen on radar*!"  R.37 at 14 & Ex. 6 (J.A. __) (emphasis added).  FAA does not

49

adequately explain why the use of the ASR-11 would be an acceptable solution given the real-world limitations revealed at Travis Air Force Base.

Finally, FAA's 2010 Radar Report also admits that the ASR-11 may not work; it expressly recommends that "[a]s a last resort, [FAA should] revise the Cape TRACON airspace and procedures to restrict air traffic in the wind turbine area to only aircraft with beacon transponders." R.54 at 17 (J.A.__). As discussed above, this "solution" is not a mitigation measure, but rather an admission that the effects of the Turbines cannot be mitigated.

### B.   FAA Unreasonably Dismissed Substantial Evidence of Other Adverse Effects to Radar

FAA also erred by failing to address Petitioners' – and its own – evidence of other adverse effects to the Otis ASR-8 and the other Cape radars. *C.f. Simpson v. Young*, 854 F.2d 1429, 1434 (D.C. Cir. 1988) (agency must consider significant evidence on both sides of the question and must explain its conclusions in light of significant objections).

#### 1.   FAA Did Not Address Evidence Of Shadowing Effects To Secondary (Beacon) Radar

The 2012 Determinations fail to address shadowing[14] impacts to secondary (beacon)[15] radar. The 2009 Radar Report concluded that fading "will" cause

---

[14]     Wind turbines, due to their height and width, can obstruct a radar's coverage. The loss of coverage occurring behind the turbine is referred to as a radar shadow. R.53 at B5 (J.A. __).

beacon misses below 600' within 2 nm of the Turbines. R.53 at 34 (J.A. __). The 2009 Report dismissed this evidence as insignificant because "[t]raffic patterns indicate that pilots do not fly below 600' in the vicinity of the [Project]." *Id*. However, FAA's own evidence shows that there ***are*** a significant number of low-level operations – sometimes up to 9 flights a day – directly over the proposed Project site below 949'. R.51 at 7 & A-9 (J.A. __) (MITRE Report). In addition, APNS presented evidence of FAA's own radar data showing a significant number of flights over the Project area, often below 500'. R.37, Item 1112 Ex. 42 at 6 (J.A. __) (10 VFR flights below 500' ASL flew over the Project site on July 14, 2007).

The 2012 Determinations, however, entirely fail to acknowledge the evidence of actual flights that may be impacted. Rather, FAA summarily concludes that: "Studies indicate that there would be no noticeable effect on beacon … radar service because the proposed turbines are not likely to affect the detection of aircraft with an operational transponder." R.56 at 4 (J.A. __). This is simply inconsistent with the Record evidence that flights below 600' will be impacted, and that a significant number of such flights occur. Further, the Record indicates that a large number of aircraft operate *without* transponders, the detection

---

[15]     Beacon radar (also referred to as transponder or secondary radar) is a communications system between a ground station interrogator at the radar and a transponder in an aircraft. The system therefore only works when aircraft are equipped with transponders. R.53 at A1 (J.A. __).

of which *would* be affected by the Turbines. *E.g.*, R.37, Item 1112 Ex. 45 ¶16 (J.A. __) (approximately 20% of flights at HYA, and a large portion of other flights at nearby airports operate without transponders). The existence of a significant amount of traffic that may be impacted is precisely why FAA's 2010 Guidance requires further analysis of potential wind farm impacts in heavily-trafficked "coordination zones" such as the Project area. *See* R.55 at 5 (J.A. __). FAA's complete failure to acknowledge the consequence of the risk to the low-flying flights in the Project Area is therefore inexplicable.

### 2. FAA Did Not Address Evidence Of Shadowing Effects To Primary (Search) Radar

Similarly, FAA's conclusion that there would be no shadowing impacts to primary radar has no support in the Record. First, FAA's statement that "the wind turbine proposal … does not present line-of-sight-shielding issues" to the ASR-8 is directly contradicted by evidence in the Record. *E.g.*, R.53 at 6 (J.A. __) ("all three [radar] positions have line of sight to the proposed wind farm."). FAA never explains these contradictions. *Cont'l Air Lines,* 551 F.2d at 1303 (agency must explain apparent inconsistencies).

Second, the Record evidence shows, and FAA admits in its 2012 Determinations, that there *will* be shadowing impacts to primary radar. *E.g.*, R.53 at 34 (J.A. __) (2009 Radar Report); R.56 at 5 (J.A. __) ("targets below 800 feet and within 3 nautical miles of the wind farm may potentially be affected"). Even

if, as FAA concludes, these primary losses would be only "brief and intermittent," R.56 at 5 (J.A. __), the relative rarity of the loss of coverage would be of little comfort to the victims of an accident in one of those periods of lost coverage. Moreover, as noted above, the MITRE Report documents a significant number of operations – sometimes up to 9 a day – below 949' directly over the proposed Project site that could be affected.  R.51 at 7 & A-9 (J.A. __ & __).  Again, FAA's failure to consider the impacts to actual traffic in this heavily-trafficked "coordination zone" is unreasonable.

Finally, FAA never addresses Record evidence demonstrating that there could be impacts when either the Nantucket or the Otis radar is out of service. R.53 at 34 (J.A. ___) (2009 Radar Report notes a possibility of primary misses below 1,000' over Nantucket and Otis, which could impact air traffic operations if either radar were required to provide coverage for the other airport).  The 2009 Report dismisses these findings on the grounds that each radar provides better coverage in the area where coverage is degraded for the other radar. *Id*.  However, as FAA admits, when one of those search radars is out of service, FAA relies on the other for coverage.  *Id*.  Parts of the approaches to Nantucket are directly behind, and therefore would be shadowed by, the Turbines, from the perspective of the Otis ASR-8.  R.53 at 23, Fig. 19 (J.A. __).  Thus, when the Nantucket ASR-9 is out of service, all operations below 1,500 feet, *including all approaches to*

*Nantucket*, would be directly compromised. FAA did not analyze these issues or provide any substantial reason why these issues were not a concern.

### 3. FAA Failed To Address Evidence Of Decreased Probability of Detection For Primary Radars

The 2012 Determinations also conclude that the probability of detection for the ASR-9 "may decrease" as a result of clutter, but that it is not expected to drop below acceptable values.[16] R.56 at 5 (J.A. __). The Determinations imply that the fact that the ASR-9 has been upgraded with a 9PAC-II processor augmentation card ensures that any impacts will be minimized. *Id*. The 9PAC-II works by raising the detection threshold so that the radar does not "see" the clutter caused by the Turbines. The obvious tradeoff is that it reduces the sensitivity of the radar making it less likely that the radar will detect any aircraft in that area. R.53 at B2 (J.A. __). Therefore, the 2009 Radar Report concluded that:

> … the dynamic geocensor function of the ASR-9 will raise the detection thresholds over the wind farm high enough to decrease the probability of detection over the wind farm by as much as 10 – 20%.

R.53 at 26 (J.A. __). Tech Ops reiterated these concerns in its 2012 Responses. R.52 at 2 (J.A. __) ("This could result in a decrease of the search reinforcement rate over the wind farm, or primary misses of aircraft without transponders").

---

[16] FAA takes the position that a probability of 90% or better is desirable but for search radars, a probability of detection of 80% or better is considered satisfactory. R.53 at 11 (J.A. __).

Moreover, the probabilities of detection discussed in FAA's 2009 Radar Report are averages and do not address the critical issue of the actual probability of detection at the specific point in time when an aircraft flies near the Turbines. R.37, Item 1112 Ex. 42 at 7 (J.A. ___).  In fact, FAA's own Report notes certain instances in which the probability of detection **will** drop far below acceptable levels:

> If the blades are moving with a large radial component with respect to the radar, ***detection over each wind turbine will approach zero.***

R.53 at 12 (J.A. ___) (emphasis added).  Yet FAA simply dismisses the reality that the probability of detection for either radar "will approach zero" by simply asserting that "this level of impact to the primary radar does not constitute a physical or electromagnetic effect on the operation of these navigation facilities." R.56 at 5 (J.A. ___).  In so doing, FAA eviscerates the entire purpose of the statute. *E.g.,* 49 U.S.C. §44718 (Addendum 38-39) (Secretary must determine whether there would be any "interference with air navigation facilities and equipment"; if so, Secretary must consider  the "extent of any adverse impact on the safe and efficient use of the airspace, facilities, or equipment").

### 4.     FAA Failed To Fully Analyze Impacts To The Truro ARSR-4

FAA erred by stating that the distance between the Turbines and the Truro ARSR-4 and the elevation angle of the ARSR-4 "results in no effect …"  R.56 at

4-5 (J.A. __). This conclusion directly contradicts the finding in the 2009 Radar Report that ARSR-4 will cause reductions in probability of detection for the ARSR-4 in the Project area *at elevations up to 10,000'*. R.53 at 13 (J.A. __).[17] It also contradicts Petitioners' evidence that, despite the distance between the Turbines and the ARSR-4, the Turbines *would* interfere with the ARSR-4 by causing clutter interfering with ATC communications and false collision alerts at the controller's position. *E.g*., R.37, Item 1112 Ex. 41 at 3-4 (J.A. __) (at least the top 100 to 150 feet of the Turbines, *i.e*., where the blades are turning, will be in line-of-sight of the ARSR-4 and will create adverse effects); *see also* R.35A Ex. 2 at 12 (J.A. __) (Brookner report concluding that the Turbines will create a cone of silence around the ARSR-4 that will "prevent the detection of small aircraft flying low over the wind farm"). Once again, FAA's failure to examine the increased consequences of risk in this "coordination zone" is unreasonable. R.55 at 3 (J.A. ___).

###### 5. FAA Did Not Take Into Account the Unique Weather Conditions in Nantucket Sound

FAA's mitigation measures also do not address, and FAA never analyzed, Record evidence regarding the effects of local temperature inversions that can "duct" the radiated energy closer to the earth surface. R.37, Item 1112 Ex. 41 at 4

---

[17]     Moreover, the 2009 Radar Report openly admits that impacts to the ARSR were "not [ ] treated as rigorously." R.53 at 5 (J.A.__).

(J.A. ___); R.37, Item 1112 Ex. 46 at 2 (J.A. ___). The effect of such weather events is to intensify reflected energy, and to cause more returns, at higher intensity, which, in turn, increases the clutter on the controllers' display, further complicating air traffic controllers' ability to manage traffic in the area. *Id.* This weather condition is very likely to occur in the summer months in Nantucket Sound – at precisely the same time when the area experiences higher levels of traffic. FAA should have analyzed this effect before presuming that the known interference with radar would not be "significant."

### 6. The Determinations Failed to Impose Mitigation Measures That FAA Itself Identified as Necessary

Finally, FAA erred by failing to incorporate mitigation measures that its own experts recommend. The 2009 FAA Radar Report made several recommendations, including the need to modify and update digital displays, to ensure that there were no radar performance problems before the Turbines were installed, and to take winter and summer baseline recordings before the Turbines were installed. R.53 at iv (J.A. __). FAA's 2010 Radar Report also included various recommendations, including revising the Cape TRACON airspace and procedures to restrict air traffic in the Project area to only aircraft with beacon responders. R.54 at 17 (J.A. __). FAA failed to include these as required mitigation measures in the 2012 Determinations and failed to provide any reasonable explanation for why they were omitted.

## IV. FAA FAILED TO PERFORM OR PARTICIPATE IN ANY ANALYSIS OF THE ENVIRONMENTAL IMPACTS OF ITS DECISION AS REQUIRED BY NEPA

NEPA requires that federal agencies study and disclose the environmental consequences of major federal actions *before* deciding to pursue such action.  42 U.S.C. §4332(2)(C) (Addendum 57-58).  "Major federal action" is defined to include "actions with effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. §1508.18 (Addendum 60). "Effects" is defined to include "Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.* at §1508.8(b) (Addendum 61).

 This Court has recently clarified that "major federal action" includes agency actions that do not grant licenses or permits when it is "reasonably foreseeable" that the action "will be used to enable licensing decisions based on its findings." *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 476-77 (D.C. Cir. 2012) (NRC required to comply with NEPA when issuing a non-permitting "waste confidence decision").

Despite the significant environmental impacts of the Turbines, including risks to aviation safety, R.37, Item 1112 Ex. 47 at 24 (J.A. __) (MMS Record of Decision), FAA did not participate in MMS's environmental impact study, *id*. at 62 (J.A. __), or conduct its own NEPA analysis, R.27 at 1-2 (J.A. __).  FAA takes the

position that its Part 77 decisions are not subject to NEPA because they are "advisory in nature and cannot control whether a development goes forward." R.27 at 1-2 (J.A. __).

That is incorrect in this case. As FAA itself concedes, R.27 at 1-2 (J.A. __), and this Court has held, 659 F.3d at 32, CWA's ability to construct the Turbines is *explicitly* conditioned on FAA issuing a no hazard determination under Part 77. R.37, Item 1112 Ex. 47 at 24 (J.A. __). Moreover, CWA is required to perform any mitigation that FAA might require as a condition of its no hazard determination. *Id.* Thus, FAA's Determinations have the kind of "preclusive" effect on subsequent permitting decisions that make it "not only reasonably foreseeable but eminently clear" that they will "be used to enable licensing decisions based on [their] findings." *New York*, 681 F.3d at 477. Accordingly, FAA's Determinations are "major federal actions" subject to NEPA. Because FAA conducted *no* analysis under NEPA, the 2012 Determinations should be vacated and FAA directed to comply with NEPA.

## CONCLUSION, RELIEF SOUGHT AND REQUEST FOR ORAL ARGUMENT

For the foregoing reasons, the Petitioners respectfully request that the Court grant the Petition for Review and vacate all 130 2012 Determinations of No Hazard. Petitioners further request that the Court schedule this case for oral argument.

59

Respectfully submitted this 17th day of December, 2012.

/S/
_____

W. Eric Pilsk,
epilsk@kaplankirsch.com
Catherine M. van Heuven,
cvanheuven@kaplankirsch.com
Kaplan Kirsch & Rockwell LLP
1001 Connecticut Ave., N.W.,
Suite 800
Washington, DC 20036
Telephone: (202) 955-5600

Charles S. McLaughlin, Jr.
Assistant Town Attorney
Town Hall - 367 Main Street
Hyannis, MA, 02601
Telephone:  (508) 862-4620
Facsimile:  (508) 862-4724

Counsel to Town of Barnstable

_____

Charles C. Lemley,
clemley@wileyrein.com
Edward P. Faberman,
efaberman@wileyrein.com
Wiley Rein LLP
1776 K Street NW
Washington, DC 20006
Telephone: (202) 719-7000

Counsel to the Alliance to Protect
Nantucket Sound

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 28(a)(11) and 32(a)(7)(C), I hereby certify on this 17th day of December, 2012, that the portions of the foregoing Petitioners' Brief subject to a type-volume limitation contain 13,880 words, as counted by the Microsoft Word 2007 word processing program.


   /S/
W. Eric Pilsk
Attorney for Petitioner Town of Barnstable

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of December, 2012, I caused to be served by ECF and overnight delivery a true copy of the JOINT BRIEF OF PETITIONERS TOWN OF BARNSTABLE and THE ALLIANCE TO PROTECT NANTUCKET SOUND on the following persons at the following addresses:

Daniel J. Lenerz
Senior Counsel to the Assistant
Attorney General
Criminal Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
(202) 532-6045

Christopher H. Marraro
Geri Edens
Baker Hostetler
Washington Square
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, D.C. 20036-5304
(202) 861-1594


___/S/_____
W. Eric Pilsk
Attorney for Petitioner Town of Barnstable

62